Judge Haggin
delivered the opinion of the Court.*
ON the 2nd day of May, 1T80, Moses Jeffries obtained from the land-office a treasury warrant for 400 acres, which appears to have been assigned by Jeffries to Abraham Hanks, on the 12th day of July, 1781, and by Hanks assigned to Joseph Botts, o.n the 25 th of July in the same year.
On the 6th of December, 1782, Botts, as the assignee of this warrant, made an entry with the surveyor of Fayette county, for 400 acres ofland, “ beginning where William Calk’s east line of his pre-emption, crosses the east prong of Small Mountain creek, and extending with his line down the creek; then eastward and southward for quantity.” This entry was, surveyed on (he 22d of September, 1798, and patented to Botts on the 25.th of May, 1803.
Chiles recovered a judgment in ejectment against Botts and tenants, in virtue of a grant to James Ha th-way, bearing date the 2d of December 1785.
The h,eirs of Botts filed their bill in chancery, enjoining proceedings on the judgment in ejectment, and praying that Chiles might he compelled to release to them, predicating their equity upon the entry aforesaid.
Chiles answered, admitting the entry, survey and grant; but controverting tne specialty of the entry,, He subsequently answered, not admitting that Bolts was entitled by assignment to the warrant, nor the making of a survey upon the entry, as stated by the complainants in their hill, nor that it was made upon the land in controversy. The court dismissed the bill.
Proof was then taken, conducing to establish the assignment of the warrant. But surely, after the acquiescence of forty years by the proprietor, and the entry, survey and grant publicly made, under the superintendence of disinterested and competent officers ©/'government, it is not reasonable to require other proof of the execution of the assignment, upon the negative of a, stranger to the transaction, and an alien in interest. *37 Witnesses are dead, and so are those who knew them, in favor of titles those things must, prima facie, be taken to have been properly done.
Whether the marks were made or adopted by the survey, the purpose • is equally attained.
An entry is a specific appropriation of the land, and in 1782, there was no time in which the owner was compelled to survey.
Acts of Virginia limiting the time for execution of surveys of ’8<i and ’97, unlike the olfi- or acts, looted to theend, oftlie sur-10'1 veys, and proscribed th<ft0imend0d without’ex-ccption or ^IPns *'j0int° oefout In the othprs.
*37 The identity of the survey, once admitted and now denied, is established. Some of the objects, it is true, have been destroyed; but their situation is pointed out with reasonable precision, by living witnesses, and the remains of other objects are yet visible, which, aided by reference to the pre-emption line of Calk, and the courses and distances reported by the surveyor, enable the court very satisfactorily to bound the survey. Nor can the suggestion that those objects were marked upon a private and inofficial survey, avail. Whether marked or adopted by the surveyor, the purpose is equally attained.
Touching the specialty of the entry, it was declared valid, and a construction given to it.by the Court of Appeals, in the case of Botts and Spurgen, in the Spring term, 1817. We have looked into that record, and find the preparation in this respect, substantially the same. Due regard for the opinious of our predecessors and the repose of society, should require some hesitation in overruling that decision, were doubts entertained of its correctness. But we concur with that court.
The eastern boundary of the pre-emption of Calk, should be with the stream, and the survey of the entry under consideration, should commence at the junction of the eastern and southern prong of Little Mountain creek and extend down the creek; and thence at right angles, eastwardly, to the general course of that line, so far as to include tlie quantity as nearly in a square as practicable.
Thus laid down, the survey of Botts will cover a part of the land in controversy. But the objection is raised, that Botts forfeited his claim by a failure to survey within the time limited for that purpose.
At the time when Botts and Hathway respectively purchased their warrants, and when the former made his entry, which was a specific appropriation of the land, the law prescribed no limit, but gave to him and the surveyor an indefinite period to survey. Their convenience and pleasure were alone to be consulted.
The Legislature of Virginia, however, in the year 1784, in aid of her revenue, to impose a tax upon appropriated lands, and further expose her vacant lands, *38 an(j for these purposes only, passed an act requiring all treasury warrant entries to be surveyed, on or before the first day of February, 1786. In the year 1785. with the same intent, it was provided that the surveyors should give notice to proprietors and agents, with? *n ^eir counties, and proceed to survey immediately after the 1st day of January, 1787, and declaring void all entries, the owners of which,'not residing in the county> should fail to appoint agents and give notice of such appointment, before that day; or who, upon notice to themselves or.agents, should not co-operate with the survcyor inlaying off and bounding their land; and by subsequent statutes, the time was still prolonged- for a compliance with that act, until 1797, when it was enacted that ten months, from and after the last day of November in that year, should be allowed for the making of surveys. The survey of Bolts was mad.e before tha expiration of that period.
Hence, where a sur-eutedTn the" timo allowed by the act of (hrthe^ncMl be enquired; it is valid— Conusant, 1 onroe .
The act of 1797, is unlike those of previous sessions, 'except-lhalof 1784; all the intermediate acts requiring as a means of facilitating the object, that the proprietors who did not reside in the county, should appoint agents; that the surveyors should proceed to make the surveys; and that fora delinquency on the part o£ tlje owners, the entries should he forfeited. The acts of 1784 and 1797, without any specification of means, declares that the surveys shall be made, or the entry forfeited.
It is deemed unnecessary to enquire ifBotts lived in the county, or if he appointed an agent with a view to the provision which required the appointment of an agenC and which expired in 1796. It must-suffice, that those acts were expected by government as a means of promoting a particular end, to wit, the making of a sur-veJ uPon the entry. The act of 1797 looks to the end; recognizes the propriety and requires the survey of all entries; and that end, as relates to this claim, has been answered. The survey was made, if the survey had noj j)een ma¿je? plight be important for the proprietor to bring himself within the excuse supposed by the-statute, by proving that he had still resided in the coun-. ty, or had within the period prescribed for that puc- . pose, appointed an agent and given notice to the surveyor, and that ¡fbe fault was with that officer.
The compact with Virginia, must be expounded in the liberal spirit in which it was conceived, that the intent may prevail.
It cannot bo presumed she intended to restrict Ken» tucky and prejudice the just claimant in favor of an elder grant surreptitiously obtained, arid between such titles on ■ ly can the question be made.
That Virgin--iaintended the power to extend -the time of mak ■ ing surveys^ might b’e exercised by Kentucky, is proved by a long course of her own previous legisla» tion, and confirmed by-the fact that at the next
It is, however, contended that the acts of Kentucky enlarging the time for making s.urveys as relates to adverse claimants, can avail nothing; that the forfeiture is thus far absolute, because of the provision of the ?th Section of the act of 1789, subsequently acceded to by Kentucky, adopted into her constitution, and generally called, the compact.
By this section it is declared, “ that the private rights and interests of lands, derived from the laws of Virginia prior to the separation, shall remain valid and secure under the aws of the propos'ed State, and shall be determined by the laws now existing in this State.”
This instrument must be expounded with the same liberal spirit in which it was conceivdd, that the intent may prevail.
All acknowledge the moral power on the part of Virginia, to extend, as she frequently did, the time for making surveys upon treasury warrants. Indeed, there can be no pretext for the negative of this, as relates to the present parties, when we reflect that when they both purchased their warrants and made their entries, which was their first appropriation, there was no limit for surveying, and that this doctrine of forfeiture is the effect of subsequent legislation.
The high regard which we know our parent State has ever entertained for individual rights, forbids the conclusion that Virginia imposed this limitation-to prejudice the just claimant, and in favor of an elder grantee, by patent surreptitiously obtained, and between none except such titles as these, can this question be made; for the complainant must always provo a clear equity, before he can successfully assail an elder grant.
These statutes were all adopted for public good, and were not designed to subserve private purposes and particular interests.
Virginia transferred to Kentucky her sovereignty,-as she herselfenjoyed it,overthe new territory, with an expectation of introducing an additional and equal member into the Union of the States. In doing this, she required the stipulation recited. She also provided against the exaction of unequal taxes, the infliction of penalties and forfeitures for non-improvement by landholders, or the grant of lands interfering with claims derived from Virginia, or the appropriation of lands re *40 served by Virginia for certain claimants, previous to the year 1792.
session after tiie passage of the act which constitutes the compact, she exorcised it.
The motives which induced Virginia to hasten the execution of the surveys, ceased at the separation. She ivas under no moral obligation to bind Kentucky to impose the forfeitures ; nor was she at liberty to do it.
There is no principio of our govern1 ment, which confers on an individual the control of its power to redeem from forfeiture, that he may gain.
These provisions combined', manifest a high concern on the part of Virginia, for rights derived under her. Their preservation was her sole object. She had exercised great forbearance. She had enlarged the time for laying in the claims of settlers and improvers, for obtaining and locating pre-emption warrants, and for surveying all claims. If the question had been proposed to Virginia, did she intend to inhibit further indulgence to those who had purchased and made entries ui\der her, and to insist on rigid forfeitures, most assuredly the answer would 'have be'en in the negative. Her act of the next session confirms this opinion. She, in the year 1790, prolonged' the time for surveying and returning the plats and certificates. She sought the protection of her purchasers. Kentucky adopted her views, and granted their terms. Shall this be cause of complaint on the part of Virginia? It would seem impossible.
But we have said, and the terms of the acts of assembly maintain us, that this regulation expediting surveys, was an after act, and made with an eye to the revenue. When Virginia transferred to Kentucky, she had no further motive to urge. The tax and proceeds of sales, were thenceforth to be received and enjoyed by the new State. ' Suppose Kentucky had resolved on a different means for defraying its expences, and repealed the act limiting the time for surveying. We cannot suppose Virginia would have objected. The reason for the requisition failing, as related to both States, there could have been no motive for its continuance.
In acquiescing in this, Virginia could not be charged with a want of impartial justice, as related to its citizens. Nor could it be said of Kentucky, that she had outraged her covenant with her parent State. The adverse claimants would then be left to their original merit. ■ And more than this, neither hada right to expect. Nor was Virginia morally bound, or at liberty to exact it.
It cannot be admitted, that Chiles had a right to expect his Country to persist in the limitation and forfeit the title of Botts, that he might enjoy the property; nor that Virginia was bound by any moral or just sense, to *41 promote such a purpose. To this sinister end, the States never legislated.
June 18.
The acts extending the areconsiienS with the com:paictj t Tlwir maintained by the gener» sjla“ 1^®r" f unpeople,, the legal in-' telligence adjudica-™1 tionsofthe courts, with ception of?* opinion af-terwards __ withdrawn*
A contrary construction would certainly operate very unjustly. Botts, and those in his condition, although sometimes admonished and threatened, were again promised time. They probably could and would, although under inconveniences, except for this assurance, liave made their surveys and secured their land. Now they are told that their government had no such power. ft was but delusion, and all is lost. We can perceive nothing of merit in Chiles, nor any thing in the compact, nor are we apprised of the principle of our government, which will confer upon an individual the control of its to redeem from forfeiture and
In corroboration of this opinion, we believe we might rely upon the general understanding of the citizens of our country, the united opinion of the bar until within a very few years, and the uniform adjudications of our courts, State and Federal; and in opposition we find but one opinion, which was ultimately resolved inappliea-ble, and withdrawn, with a full declaration that it must not be understood as deciding the question. See the cases Kendall and Slaughter, 1 Marsh. 375; Shipp vs. Miller's heirs, 2 Wheaton 324.
We are, therefore, of opinion, that the complainant made out a clear equity to so much of the land in controversy as will be embraced by a survey made agreeably to the construction now given the entry of Botts.
Decree reversed with costs, remanded to circuit court to take further proceedings, and decree conformably to this opinion.
The counsel for appellees moved the court for a rehearing of the questions of the construction of the statutes extending the time for making the surveys, and of their alleged inconsistency with the Compact, and showed the grounds of their motion, in the following

 Judge Trbíble absent